UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KENNETH BUTUSOV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 62 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| MARSHALL JAMES, JR., M.D., and | ) | |
| ROBIN ROSE, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiff Kenneth Butusov, a former Illinois Department of Corrections ("IDOC") inmate housed at Sheridan Correctional Center ("Sheridan") and a paraplegic, filed this lawsuit against Defendants Dr. Marshall James, the Sheridan medical director, and Robin Rose, the Sheridan health care unit administrator ("HCUA"). Butusov contends that Dr. James and Rose exhibited deliberate indifference to his medical needs by delaying in sending him to the University of Illinois at Chicago ("UIC") or other hospital when he showed signs of infection on and around July 11, 2016. Dr. James and Rose have separately filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. Because no reasonable jury could find that Dr. James or Rose exhibited deliberate indifference to Butusov's medical needs on July 11, 2016, or otherwise during his time at Sheridan, the Court grants the motions for summary judgment and enters judgment for Dr. James and Rose.

## BACKGROUND[1]

In 2000, Butusov suffered a gunshot wound, rendering him a paraplegic. Because he could not urinate on his own, he used a permanent suprapubic urinary catheter to drain his urine. Use of such a urinary catheter carries the risk of catheter-associated urinary tract infections ("CAUTIs"). Historically, Butusov experienced CAUTIs approximately twice a year.

In 2012, while incarcerated at the Cook County Jail, Butusov's right hip became infected, causing osteomyelitis, a bone infection.[2] Butusov testified that he became septic and needed to have his right leg amputated. The osteomyelitis became a chronic condition in the remaining bone. According to Butusov, on approximately six occasions, his chronic osteomyelitis became acute and needed treatment.

At the time of the events at issue, Butusov was thirty-eight years old and incarcerated at Sheridan. Dr. James, a Wexford Health Sources, Inc. ("Wexford") employee, served as the Sheridan medical director at the time. He graduated from Chicago Medical School in 1995 and completed a family medicine residency at Stroger Hospital. Dr. James and another physician treated inmates at Sheridan's infirmary. Rose, a licensed registered nurse, served as the HCUA at Sheridan. In that role, Rose monitored the health care department and oversaw the Illinois Department of Corrections ("IDOC") employees who worked in the health care department. She did not physically assess any inmates or provide them with medical treatment in her role as the HCUA. Heidi Demes worked as an IDOC correctional nurse trainee at Sheridan.

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts, Butusov's response, and the exhibits attached thereto. The Court has considered Dr. James and Rose's objections to Butusov's additional facts and included in this background section only those facts that are appropriately presented, supported, and relevant to resolution of the pending motions for summary judgment. The Court takes all facts in the light most favorable to Butusov, the non-movant.

[2] The parties' Joint Statement indicates that the hip infection occurred in 2003, but Butusov's deposition and medical records reflect a 2012 date.

During his incarceration at Sheridan, IDOC housed Butusov in the infirmary, allowing him easier access to medical care. Between December 2015 and July 2016, nursing staff saw Butusov daily. Butusov received daily paraplegic assessment and care, including wound care, urinary catheter changes and flushes, and administration of pain medication. He also often saw Dr. James or another physician.

On December 7, 2015, Dr. James examined Butusov for a potential urinary tract infection ("UTI"). Dr. James ordered a urinalysis and planned for off-site infectious disease ("ID") and general surgery consultations. On December 14, Dr. James again saw Butusov, ordering the antibiotic Bactrim in response to Butusov's urinalysis results. An ID consultation remained pending at that time. On December 21, because Butusov's UTI persisted, Dr. James ordered two additional antibiotics, ciprofloxacin and minocycline. The following day, Dr. James renewed Butusov's prescriptions for Norco and Tramadol. On the afternoon of December 24, a nurse observed that Butusov was shivering and pale, with a 100.6 degree temperature. Dr. James evaluated Butusov and sent him to the Valley West Hospital ("Valley West") emergency department. Nursing staff at Valley West had difficulties starting an IV for Butusov. At Valley West, he continued on minocycline and ciprofloxacin, and began two other antibiotics, vancomycin and Levaquin. On December 25, Butusov was transferred and admitted to UIC, where he remained until December 28. UIC doctors changed his antibiotic treatment to cephalexin (Keflex). UIC urologists noted that Butusov's "bladder has been managed with a suprapubic tube as he has [a history] of urethral strictures." Doc. 105 ¶ 17. After Butusov's return to Sheridan, on December 29, Dr. James saw Butusov, ordered Keflex for him, and noted that he had a pending ID appointment at UIC.

On January 4, 2016, Dr. James saw Butusov, who reported that he was doing well but wanted to change his baclofen prescription for muscle spasms to Valium. Dr. James placed an order for Valium. The next day, Butusov complained that he had not yet received the Valium, causing Dr. James to note he would check on the order. Dr. James also noted the approval of an ID consultation that day. On January 7, Dr. James saw Butusov, who reported that the new Valium prescription controlled his muscle spasms.

On January 8, UIC ID physician Dr. Vijay Yeldandi saw Butusov for a follow-up concerning his chronic osteomyelitis. Butusov reported feeling well without fevers or chills, and Dr. Yeldandi noted that he did not observe any signs of an acute infection. Under the treatment plan for chronic osteomyelitis, Dr. Yeldandi instructed that if Butusov "develop[ed] any signs or symptoms of an acute infection," an ID physician should evaluate him. *Id.* ¶ 22. Upon Butusov's return to Sheridan that day, he saw Dr. James, who noted Dr. Yeldandi's recommendations, ordered an air mattress for Butusov, and submitted a referral for a urological specialist appointment. On January 11, Dr. James noted the approval of that referral. On January 18, Dr. James saw Butusov and prescribed medication for increased salivation that was causing drainage in Butusov's tracheostomy tube. On January 29, Dr. James saw Butusov and renewed his Valium prescription. On February 1, Dr. James saw Butusov and renewed his Tylenol 3 prescription. Dr. James also noted that Butusov had upcoming off-site appointments with ID, general surgery, and urology. On February 3, Dr. James saw Butusov, noting Butusov's refusal to go to an ID appointment because Sheridan did not have an available ADA van to transport him. Dr. James indicated he would reschedule the appointment and also renewed Butusov's Toradol prescription.

On February 17, Butusov saw another physician at Sheridan and complained of foul-smelling urine. The other physician assessed Butusov as having a presumptive UTI, in part based on his history of frequent UTIs. He planned to test Butusov's urine and also prescribed him ceftriaxone.

On February 23, Dr. James noted that Butusov had been approved for an appointment with UIC ear nose and throat ("ENT") specialists for a tracheostomy closure. Dr. James also renewed Butusov's Norco prescription. On February 24, Dr. James continued the ceftriaxone prescription for Butusov's continuing UTI. In the days thereafter, Butusov did not show signs or symptoms of a UTI.

On March 1, Dr. James saw Butusov after his UIC ENT consultation. Dr. James submitted a referral to have Butusov's tracheostomy stoma closed, per the UIC ENT recommendation. Dr. James also prescribed Toradol, an anti-inflammatory medication, for Butusov.

On March 11, Dr. James saw Butusov, who requested a weekly bladder flush. Dr. James indicated he would check with Rose about the possibility of doing so at Sheridan. On March 15, Dr. James saw Butusov, renewed his Valium prescription, and reported that Butusov's weekly bladder flush request had been approved. On March 21, Dr. James renewed several medications for Butusov. On March 24, Butusov reported to Dr. James that he was only receiving Norco once instead of twice daily, prompting Dr. James to confirm that Butusov should receive it twice daily. On March 31, Dr. James saw Butusov, who complained of breakthrough pain in the evenings. Dr. James prescribed additional medication for this pain.

On April 5, Butusov had his tracheostomy stoma closed at UIC. He returned to UIC the following week to have his surgical sutures removed.

5

At an April 18 appointment, Dr. James noted that a urine culture indicated that Butusov had another UTI. Dr. James prescribed antibiotics and placed Butusov on contact isolation. On April 21, Dr. James prescribed a second antibiotic for Butusov's UTI. On April 26, Dr. James again saw Butusov, noting he was stable and had a healed wound around his catheter. Dr. James continued Butusov's prescriptions. Butusov did not have any signs or symptoms of infection in the days after this visit.

On May 2, Dr. James renewed Butusov's Tylenol 3 prescription and also ordered him Toradol at his request. On May 9, Butusov had no medical complaints for Dr. James but requested a new mattress. Dr. James indicated he would check on this request. On May 11, Dr. James renewed Butusov's Valium, Norco, and catheter flush orders. On May 13, Butusov reported to Dr. James that a pinhole had developed in his previously closed tracheostomy stoma. Dr. James requested a referral to UIC ENT, which Wexford approved on May 17. When Dr. James saw Butusov on May 23, Butusov indicated he had no complaints and was stable. On May 27, Dr. James renewed Butusov's pain medication and catheter flush prescription.

On May 28, Butusov complained of having chills overnight. Upon examination, he did not have a fever, with his temperature instead reading 98.8 degrees. His catheter was draining a red-cranberry color, however, and the suprapubic site had a yellow or tan discharge. At 10 p.m. that day, Butusov noted he drank a lot of water during the day, with his urine color returning to normal. After Dr. James received the susceptibility results from Butusov's urine culture from UIC, he placed Butusov on clindamycin.

On May 31, Dr. James saw Butusov to drain ulcers on his buttock. Dr. James also noted Butusov had a positive MRSA infection around his catheter site. Dr. James noted that another physician had examined Butusov and ordered packing and possible referrals for the ulcers. Dr.

James continued Butusov's antibiotics and resubmitted Butusov's catheter urine for testing. On June 1, another physician saw Butusov, reviewed his urine cultures, and assessed Butusov as having a complicated UTI. The physician continued the antibiotic Dr. James had prescribed and added another antibiotic. Due to development in Butusov's skin wound, he also submitted a referral to UIC for a surgical consultation. The other physician again saw Butusov on June 6, noting that Butusov continued to receive antibiotics to treat the UTI. In response to a request from Butusov, the physician changed the delivery of the antibiotics from an injection to an IV. Dr. James also saw Butusov on June 6, noting that he had been referred to UIC urology for evaluation. Dr. James also ordered Butusov an egg crate mattress that day. On June 7, the other physician noted that Butusov's IV site had become unusable, with subsequent IV attempts unsuccessful because Butusov was "a difficult stick." *Id.* ¶ 46. The physician noted improvement in Butusov's urine character and color, and continued Butusov on antibiotics.

On June 9, Butusov had ENT and colorectal appointments at UIC. Dr. James saw Butusov upon his return to Sheridan, noting that Butusov was stable and that the UIC doctors had recommended an ENT follow up but holding off on the urology referral.

On June 12 at 12:10 a.m., a nurse saw Butusov, who reported chills. He had a 100.9 degree temperature, and so the nurse gave him Tylenol. By 10 p.m., Butusov's temperature had returned to 98.7 degrees. On June 16 at 12:00 a.m., Butusov had a 99.7 degree temperature, which had returned to 98.7 degrees at 10 p.m. On June 17, Butusov reported feeling chilly and had a 101 degree temperature. After being contacted about Butusov's fever, Dr. James ordered Tylenol, intramuscular antibiotics, and a urine culture. Later that day, Butusov refused the antibiotic, indicating he would not take any antibiotics until "they sen[t] [him] out and f[ou]nd out what [was] wrong with" him. *Id.* ¶ 51. On June 18 at 12:00 a.m., his temperature returned to

7

98.6 degrees, and he denied any discomfort. At 8 a.m., Butusov again refused the antibiotics, and at 10 a.m., his temperature was 98.8 degrees. He continued to refuse antibiotics at 8 p.m., and he had a 97.9 degree temperature at 10 p.m. At 12 a.m. on June 19, Butusov's temperature had risen to 99.2 degrees, but he again refused antibiotics at 8 a.m. That evening, at 10 p.m., he had a 99.5 degree temperature, but he refused antibiotics and Tylenol. At 12 a.m. on June 20, Butusov had a 98.3 degree temperature. He refused antibiotics at 8 a.m. and 9 p.m. After Butusov requested a referral to UIC for treatment, nursing staff contacted the other Sheridan physician, who indicated he would submit a referral to UIC's urology service. Wexford approved the referral on June 21. That same day, Butusov continued to refuse the prescribed antibiotics. The following day, Butusov's temperature had increased to 101 degrees. He took Tylenol for the fever, and by 12 a.m. on June 23, his temperature had dropped to 98.1 degrees.

On June 28, Butusov saw Dr. Yeldandi at UIC. Dr. Yeldandi assessed Butusov to have a CAUTI with multi-drug resistant pathogens. He noted Butusov was not symptomatic at that time, recommended a repeat urine culture, and noted that "if symptomatic (Fever, nausea/emesis) please try Amikacin 750 mg once daily for 3 days." *Id.* ¶ 58. On June 29, the other Sheridan physician evaluated Butusov and entered a non-formulary order for Amikacin, ordered a urine culture, and renewed Butusov's pain medicine prescription. A June 30 urine culture showed no infection but contamination with normal flora.

On July 4, Butusov reported feeling chilled, but his temperature was only 98.1 degrees. At 9 p.m., his temperature had risen to 99.1 degrees as he continued to complain of chills. On July 6, Butusov had a 97.6 degree temperature. On July 7, Dr. James saw Butusov, noted the recommendation for IV antibiotics when Butusov showed signs or symptoms of infection, and planned for continued monitoring. On July 11 at 7:45 a.m., Dr. James saw and physically

examined Butusov. Butusov did not have any complaints but raised a potential issue with his stoma. Dr. James assessed Butusov as stable. At 4:30 p.m. that day, Butusov reported to Demes that he felt "feverish" and "hot all over." *Id.* ¶ 66. He had a 99.1 degree temperature, and Demes indicated a plan to monitor his temperature hourly. Between 4:30 p.m. and 7 p.m., Butusov's temperature and clinical presentation did not change. But at 7 p.m., Demes observed that Butusov appeared pale, lethargic, and diaphoretic. Butusov's temperature had risen to 102.3 degrees, and Demes noted that she called a physician with a status update. Demes did not recall who she called, and Dr. James did not recall receiving a phone call around that time. At 7:40 p.m., Butusov's temperature had increased to 102.7 degrees, he continued to be pale and diaphoretic, and he also had an elevated pulse. Demes contacted the same physician, who ordered Butusov sent to Valley West. Emergency transport arrived at Sheridan's infirmary around 8:15 p.m. A nurse notified the emergency responders of the Amikacin IV order and that they had made four attempts to initiate an IV without success. The emergency responders also tried to place an IV but could not do so. They then transported Butusov to Valley West, leaving Sheridan at 8:24 p.m. A Sheridan nurse again informed a Valley West nurse that Butusov needed three days of IV antibiotics, that Sheridan nursing staff had been unable to start the IV, and that they had given Butusov Tylenol, Valium, and Norco. Valley West doctors prescribed Amikacin, imipenem, and vancomycin for Butusov, but Valley West did not have Amikacin. A CT taken at Valley West revealed Butusov had a ureter obstruction, which was causing urine buildup. The obstruction appeared to be caused by a thickening of the wall of the ureter, without clarity as to what caused the thickening. Valley West transferred Butusov to UIC for further treatment. UIC doctors placed Butusov on imipenem and colistin. After determining that Butusov's infection was resistant to imipenem, he continued only on colistin. UIC urology

considered a potential operation to stent the obstructed ureter but could not do so because of Butusov's ongoing UTI. Instead, they placed a percutaneous nephrostomy tube to relieve the urine buildup. After Butusov stabilized on July 15, UIC physicians unsuccessfully attempted the stent procedure. He continued with a nephrostomy tube until approximately October 2021, when the tube was replaced by an ileal conduit. In the meantime, Butusov needed to return to UIC every four weeks for replacement of the nephrostomy tube.

On July 19, UIC discharged Butusov back to Sheridan in stable condition. He returned with instructions to complete a course of IV antibiotics, facilitated through a PICC line. On July 20, Butusov requested an increase in his pain medication, which Dr. James prescribed. Butusov subsequently completed his IV antibiotics.

At his deposition, Dr. James testified that he had seen numerous cases of sepsis during his career. He identified symptoms of sepsis to include lethargy, high fever, low blood pressure, major organ shutdown, high heart rate, and dry mouth. He indicated treatment would often include a course of antibiotics, with hospitalization and fluids as well. He testified that, hypothetically, if a patient had a high fever, lethargy, was pale, and could not be stabilized at the jail, the inmate should be sent to the emergency room. Sometime after July 2016, Dr. James was removed from his position as Sheridan medical director, but he remained employed by Wexford. His performance reviews indicated that he had a difficult relationship with the HCUA, had pre-written some inmate medical notes, and also had used state computers and equipment for personal use. After leaving his position at Sheridan, he received a warning for sleeping on the job, and Rose testified that she also had encountered Dr. James sleeping on the job while at Sheridan.

Rose never physically assessed or treated Butusov. She recalled having been in his room many times when he expressed frustrations with Dr. James. She also recalled going back and forth between Butusov and Dr. James, telling Dr. James that Butusov looked ill and needed to be sent to the hospital. Rose indicated she generally "did not like [Dr. James'] standard of care." Doc. 105-3 at 66:22.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by

11

admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

Health care providers violate the Eighth Amendment when they act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). Deliberate indifference has both objective and subjective elements: (1) the inmate must have an objectively serious medical condition, and (2) the defendant must be subjectively aware of and disregard a substantial risk of harm to the inmate's health. *Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020); *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016).

An objectively serious medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (citation omitted). Dr. James and Rose do not meaningfully contest the first, objective element, and so the Court turns its focus to the second, subjective element.

The subjective element of a deliberate indifference claim has two components: the defendant (1) must actually know about a substantial risk of harm to an inmate and (2) disregard that risk. *Petties*, 836 F.3d at 728; *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). This requires the defendant to act with a sufficiently "culpable state of mind, something akin to criminal recklessness." *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). Negligence does not satisfy this standard, nor does objective recklessness, i.e., "failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known." *Petties*, 836 F.3d at 728.

12

A court must "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Id.* Evidence that can support a finding of deliberate indifference includes a doctor "persist[ing] in a course of treatment known to be ineffective," a doctor "choos[ing] an 'easier and less efficacious treatment' without exercising professional judgment," or "an inexplicable delay in treatment which serves no penological interest." *Id.* at 729–30 (citations omitted). The Court considers the subjective element as to each defendant individually.

A. Dr. James

First, Butusov contends that Dr. James delayed sending him to the emergency room in the days leading up to July 11, 2016, and also appears to generally take issue with his treatment in the months before that date. To support this, Butusov argues that Dr. James departed from his own standard of care when he delayed sending Butusov to the hospital on July 11, 2016, despite Butusov presenting as septic.[3] Specifically, Butusov characterizes Dr. James' deposition testimony as standing for the fact that "septic patients 'usually must be hospitalized' and 'to be safe' the patient 'absolutely' must be sent to the ER." Doc. 122 at 12. But this misstates Dr. James' testimony, omitting the fact that Dr. James qualified his answer, indicating that when it is unclear whether someone has sepsis, "if the symptoms and [the inmate's] presentation would warrant" being sent to the emergency room, then "yes, absolutely," that should occur. Doc. 105-

---

[3] To support his contention that he presented as septic while at Sheridan, Butusov represents that Rose confirmed that Butusov likely had fevers for weeks before July 11, 2016. But Rose testified that she had no basis for confirming or denying Butusov's report to a doctor that he had "been having fevers for several weeks," Doc. 123-4 at 5, and she instead stated that she thought it "very likely" that he had suffered "[o]n and off fevers for several weeks," Doc. 105-3 at 58:1–23. Butusov's medical records indicate that he had some fevers in the weeks before July 11, but that they returned to normal with Tylenol or without intervention. And a urine culture taken on June 30 indicated he had no infection at that time, with his medical notes between then and the evening of July 11 unremarkable for any type of infection. Indeed, Butusov agreed that no evidence exists that between his visit with Dr. Yeldandi on June 28 and 7 p.m. on July 11 that he had a symptomatic UTI.

2 at 33:12–24. In other words, Dr. James indicated that a case-by-case determination was necessary as to when to send a patient to the hospital.

Additionally problematic, Butusov improperly relies on hearsay in an attempt to establish that Dr. James deviated from this standard of care. Butusov premises his claim on his recollection of a nurse at Sheridan telling him that Dr. James refused to send him to the emergency room and instead ordered the nurse to start him on IV saline fluids. He then testified that a nurse lied about being unable to start an IV in order to send Butusov to the emergency room. But no admissible evidence of such a conversation exists, particularly where Dr. James and the only nurse deposed in the case, Demes, who was on duty that evening, did not testify to such conversations. Therefore, the Court does not consider Butusov's testimony as to what a nurse told him for its truth because he has not shown that it is admissible as non-hearsay or under a hearsay exception. *See* Fed. R. Evid. 801(c)–(d), 802; *Hildreth v. Butler*, 960 F.3d 420, 428–29 (7th Cir. 2020) (district court did not err in excluding nurses' statements on summary judgment where inmate did not establish that the statements were non-hearsay); *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (courts may not consider inadmissible hearsay on summary judgment).

The admissible evidence shows that Butusov did not have a fever at 4:30 p.m. on July 11; Demes continued to monitor him every hour; she contacted an unspecified doctor at 7 p.m. when Butusov presented with a fever; she reported to the same doctor at 7:40 p.m. that Butusov's temperature had increased and that he had an elevated pulse; and that doctor then ordered Butusov sent to Valley West. Further, Butusov agreed to the fact that medical providers made multiple attempts to place an IV at Sheridan before he left for Valley West. Therefore, even

14

assuming that Demes spoke to Dr. James that evening,[4] no reasonable jury could find that his treatment of Butusov deviated from the standard of care he set forth, in which he indicated that if an inmate's symptoms and presentation warranted being sent to the emergency room, he would do so.

Next, Butusov contends that Dr. James ignored Butusov's repeated pleas for care, failing to act on July 11 and generally throughout his time at Sheridan with the appropriate concern. Again, however, the Court cannot consider the evidence on which Butusov relies, that a nurse told him that Dr. James refused to send Butusov to the emergency room, because that testimony amounts to hearsay. Moreover, that Butusov may have preferred a different course of treatment or felt like he did not receive appropriate treatment, while undoubtedly important to Butusov, is not relevant to the Court's legal determination.[5] *See Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021) ("Johnson's ultimate disagreement with defendants' course of treatment provides no basis to support defendants' deliberate indifference."); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (inmate not entitled to "demand specific care" or to "the best care possible"). Similarly, the fact that Rose testified that she went back and forth between Butusov and Dr. James also does not create a question of fact; if anything, this shows a difference of opinion between two medical professionals as to how to treat Butusov, which cannot stave off summary judgment. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of

---

[4] Dr. James testified that he did not recall speaking with Demes that evening, and Demes' testimony about whom she called amounts to speculation.

[5] Indeed, as Dr. James points out, Butusov refused to take antibiotics that Dr. James prescribed for him, which counsels against finding deliberate indifference. *See Blankenship v. Birch*, 590 F. App'x 629, 633 (7th Cir. 2014) ("[W]hen a prisoner chooses not to receive treatment, including pain medicine prescribed by a doctor, the doctor is not deliberately indifferent."), *amended in part on rehearing*, 785 F.3d 1174 (7th Cir. 2015).

15

treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). What matters is whether Dr. James' care of Butusov so deviated from professional standards of care as to suggest a lack of any medical judgment. *See Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 520 (7th Cir. 2019) (court must defer to a doctor's course of treatment unless "no minimally competent professional would have so responded under those circumstances" (citation omitted)). And the record here does not support an inference that Dr. James ignored Butusov's requests for assistance, where multiple notations in the medical record between December 2015 and July 2016 reflect Dr. James responding to Butusov's medical issues, prescribing him antibiotics, obtaining referrals to see specialists at UIC, and implementing the recommendations of those outside specialists. *See Lloyd v. Moats*, 721 F. App'x 490, 494 (7th Cir. 2017) (finding no deliberate indifference where defendants' treatment "reflect[ed] a level of continuous care that is not consistent with a malicious state of mind"); *Pyles*, 771 F.3d at 412 (finding no deliberate indifference where the defendant prescribed new medications or changed the dosages in response to the prisoner's complaints that the medications were not helping); *McGee v. Adams*, 721 F.3d 474, 481–82 (7th Cir. 2013) (finding that the defendants' "meaningful and ongoing assessment of a patient's condition [was] the antithesis of 'deliberate indifference'").

      Finally, no reasonable jury could find that any delay by Dr. James in sending Butusov to the emergency room on July 11 caused him harm. When an inmate claims that "prison officials delayed rather than denied medical assistance," verifying medical evidence is essential to show "that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007). Butusov presents no such evidence, and the record instead indicates that a relatively short period of time elapsed from when Demes recorded James' temperature as reaching 102.3 degrees at 7 p.m. to Butusov's departure for the

emergency room at 8:24 p.m. Demes testified that this turnaround was "pretty quick" given the security processes involved, Doc. 105 ¶ 74. Moreover, the most recent specialist recommendation for treatment of Butusov's UTI, obtained not two weeks earlier, indicated that if Butusov appeared symptomatic for a UTI with fever, nausea, or vomiting, Sheridan should treat him with a specific antibiotic, Amikacin, once daily for three days. In other words, a specialist did not recommend rushing Butusov to the emergency room upon presentation of a fever but rather treating him with antibiotics. *See Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016) ("Instructions from a specialist are evidence that the defendant knew a particular course of treatment was recommended by at least one other medical professional[.]"); *McGhee v. Suliene*, No. 13-cv-67, 2014 WL 576150, at *9 (W.D. Wis. Feb. 12, 2014) ("[I]t is difficult to see how Suliene could be blamed for not identifying plaintiff's need for surgery as an emergency when she was simply following the recommendations of the specialists that plaintiff saw."); *cf. Zaya*, 836 F.3d at 806 ("A jury can infer conscious disregard of a risk from a defendant's decision to *ignore* instructions from a specialist." (emphasis added)). And nothing in the record reveals the cause of the thickening of the wall of Butusov's ureter, which caused the ureter to become obstructed in July 2016. Instead, a note in his medical records from a December 2015 UIC hospital stay indicates that he had a history of urethral strictures, undermining an argument that any delay in sending Butusov to the emergency room was the cause of the obstruction. Without any medical evidence to suggest that an alleged delay in sending Butusov to the emergency room caused the obstruction, he cannot sustain his claim. *See Petties*, 836 F.3d at 730–31 ("[A] plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain."); *Quinn v. Obaisi*, No. 14-cv-6633, 2018 WL 1184736, at *6 (N.D. Ill. Mar. 7, 2018) (verifying medical evidence to show delay caused harm could include

17

"medical records or physician's notes that 'tend [ ] to confirm or corroborate a claim that the delay was detrimental' (alteration in original) (quoting *Williams*, 491 F.3d at 715)).

In summary, because a reasonable jury could not find Dr. James acted with deliberate indifference to Butusov's medical needs, the Court enters judgment for Dr. James on Butusov's claim against him.

B.  Rose

Although Rose is a nurse, Butusov's claim against her arises from her role as the Sheridan HCUA. As the HCUA, Rose did not physically assess or provide medical treatment to inmates, including Butusov. Instead, she held an administrative role, and so she had no personal involvement in Butusov's treatment, nor could she have ordered specific treatment even if she thought it was necessary. *See Hatchett v. Wexford Health Sources, Inc.*, No. 17-cv-06060, 2024 WL 4346670, at *5 (N.D. Ill. Sept. 30, 2024) (HCUA did not have the authority to override a doctor's treatment of inmates and so could not be found deliberately indifferent to inmate's medical needs); *Long v. Wexford Health Sources, Inc.*, No. 18 C 2358, 2024 WL 1283537, at *13 (N.D. Ill. Mar. 26, 2024) (HCUA did not act with deliberate indifference where no question of fact existed as to whether HCUA had a role in developing Wexford policies or had responsibility for overseeing Wexford's hiring practices and policies); *Broaddus v. Wexford Health Sources, Inc.*, No. 15-cv-1339, 2018 WL 1565603, at *4 (S.D. Ill. Mar. 30, 2018) (HCUA "had no authority to alter a doctor's course of treatment" and so could not be held "personally responsible for any harm suffered by Plaintiff").

Butusov nonetheless argues that Rose knew enough about Dr. James' lack of treatment of Butusov and his needs to require intervention. *See Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) ("[N]onmedical officials can be chargeable with the Eighth Amendment scienter

requirement of deliberate indifference where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." (citation omitted) (internal quotation marks omitted)). Here, however, the only evidence in the record about Rose's actions undercuts that theory. She testified that she acted as an intermediary with Dr. James with respect to Butusov's care to the extent she was aware of issues, pushing him to take additional action. No evidence exists that Rose knew specifically of the issues surrounding Butusov's infection on July 11, nor does anything suggest that Rose could have taken any additional actions in her role as HCUA. And, as the Court discussed above, a reasonable jury could not find that Dr. James' treatment of Butusov constituted deliberate indifference. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("As a nonmedical administrator, Peterman was entitled to defer to the judgment of jail health professionals so long as he did not ignore Berry."). For these reasons, a reasonable jury could not find for Butusov on his claim against Rose, and the Court enters judgment for Rose.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions for summary judgment [103, 106]. The Court enters judgment for Defendants Dr. James and Rose on Butusov's complaint. Case terminated.

Dated: January 21, 2025

_____
SARA L. ELLIS
United States District Judge